GEORGE S. HALL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hall v. Commissioner
Docket Nos. 4665-73, 3521-74, 4514-74.
United States Tax Court
T.C. Memo 1976-311; 1976 Tax Ct. Memo LEXIS 93; 35 T.C.M. (CCH) 1399; T.C.M. (RIA) 760311; September 30, 1976, Filed *93 Held, additional amounts of unreported income and allowable deductions determined; held, further, fraud has been established by the Commissioner for the years 1967 through 1970, but not for the years 1965 and 1966. George S. Hall, pro se. Willard J. Frank and Robert S. Walker, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner has determined deficiencies in, and additions to, the petitioner's Federal income taxes as follows: Addition Under Year
Deficiency
Sec. 6653(b) [1]
1965
$ 6,014.19
$ 3,007.10
1966
6,101.54
3,050.77
1967
32,885.48
16,442.74
1968
2,521.55
1,260.78
1969
20,969.35
10,484.68
1970
7,600.72
3,800.36 Some of the issues have been conceded; those remaining for decision are: (1) Whether some part of the petitioner's underpayment for each of the years in issue was due to fraud within the meaning of section 6653(b); (2) whether the assessment and collection of the deficiencies and additions to tax for each or any of the years in issue is barred by the statute of limitations; and (3) whether during the years not so barred the petitioner received unreported rental income or dividends; *94 realized a gain on the sale of certain property, on the surrender of an insurance policy, or upon the liquidation of a certain corporation; owned a bank account on which he should have reported interest; earned certain compensation that was paid to his father; is entitled to deductions for a fire loss and for the payment of alimony; and must recognize gain on the sale of his residence. GENERAL FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, George S. Hall, resided in Naples, Fla., at the time he filed the petitions herein. He filed his Federal income tax returns for 1965 and 1966 with the District Director of Internal Revenue, Boston, Mass., and he filed his Federal income tax returns for 1967, 1968, 1969, and 1970, with the District Director of Internal Revenue, Richmond, Va. The petitioner contends that the statute of limitations has run on the assessment of any deficiencies for some of the years at issue in this case. The Commissioner takes the position that such statute has not run on any of the years because of the existence of fraud or, with respect to some of the years, because of certain other circumstances. To decide *95 whether the petitioner's conduct was fraudulent, it is first necessary to decide how the transactions at issue should have been treated for tax purposes, and accordingly, we shall first set forth the facts of the case and our opinion with respect to the disputed transactions. 1. Income from Construction Business
FINDINGS OF FACT The petitioner is a graduate diesel engineer and was employed as an engineer for some years. He has also spent many years in the construction business and as a real estate broker. During 1965, 1966, and the first 6 months of 1967, he was engaged in the business of constructing, remodeling, and selling homes in Massachusetts. The petitioner followed a method of accounting for the sale of the homes he constructed by deducting the cost of labor, materials, and supplies in the year paid, and by deducting the cost of the land of such homes in the year they were sold. With respect to homes the petitioner bought at a foreclosure sale, he followed a method of accounting under which the cost of such homes was deducted in the year of sale, while the costs of labor and supplies incurred in fixing up such homes were deducted when paid. He has never sought or secured *96 the Commissioner's approval to change his accounting method. The parties now agree that the petitioner's actual gross receipts from such business during 1965, 1966, and 1967 exceeded the amounts reported on his returns. The actual gross receipts and the amounts shown on the returns are as follows: Amount Reported Year
Gross Receipts a
on Return
1965
$115,600
$ 86,315
1966
133,600
104,782
1967
54,700
0
The Commissioner concedes that for the years 1965, 1966, and 1967, the petitioner is entitled to deduct business expenses in excess of the amounts claimed by him on his returns. The amounts claimed by him and the additional amounts now allowed by the Commissioner are as follows: Claimed on
Additional Year
Return
Allowable Expenses
1965
$80,202.30
$17,306.25
1966
97,645.50
11,315.90
1967
0
14,792.92
The treatment of some items remains in dispute. One such item is a home at 11 Dean Street, Taunton, Mass., which was purchased by the petitioner at a foreclosure sale in 1964 for $10,025. He sold this property in 1965 and did not deduct its cost in 1964 or 1965. The Commissioner has not allowed him a deduction for the cost *97 of such property in either year. During the year 1965, the petitioner paid commissions of $1,602.50 to a realtor, Wilford J. Menoche, in connection with the sale of homes in such year. In 1966, he paid Mr. Menoche additional commissions of $3,261.00. The petitioner did not deduct such payments when he made them, and the Commissioner has not allowed him any deductions for such expenditures. The petitioner claims additional deductions in 1965 and 1966 for repairs that he claims to have made to two properties acquired by foreclosure--118 Winthrop Street and 34 Highland Street, Taunton, Mass. He admits that the repairs on the Winthrop property may have occurred in 1964. He estimates that the costs for such repairs amounted to $1,000 for each property, but he offered no records to support such claim, because he asserts that such records were destroyed by fire. In February 1966, the petitioner took a promissory note for $700 from James R. and Carolyn L. Daley, who had purchased property from the petitioner.Under the terms of the note, the obligors were to make monthly payments of $50 for 15 months beginning in February 1967.Shortly after the note was executed, the Daleys separated, *98 and the petitioner does not know their whereabouts, although he has made no effort to locate them or otherwise attempt to collect on the note. He has received no payments on Mrs. Costa for $14,000. The petitioner had this property the note, and he has not previously written off the note as a bad debt. In 1965, the petitioner purchased land from Mr. and Mrs. Costa for $14,000. The petitioner had this property surveyed at a cost of $1,000, and then he developed the land into 15 homesites in a subdivision called Bay Acres. The petitioner allocated his $15,000 costs equally among them so that each homesite had a cost basis of $1,000. He constructed homes on each of these sites and sold 4 of them in 1965, 8 of them in 1966, and the remaining 3 in 1967. In his notice of deficiency for 1966, the Commissioner allowed the petitioner, as an additional business expense, $14,031.25 for the cost of the property purchased in 1965 from Mr. and Mrs. Costa. However, after the trial of this case, the Commissioner was granted leave to file an amended answer. In such amended answer, the Commissioner pleaded that the petitioner should not be allowed a deduction of $14,031.25 in 1966 for the cost *99 of such property because, for the years 1965 and 1966 he deducted an allocable portion of such cost when each lot was sold. Consequently, the Commissioner seeks to increase the deficiency and the fraud penalty in 1966. The petitioner did not file a Schedule C (relating to profit from business or profession) for 1967, and on the Employer's Quarterly Federal Tax Return (Form 941), covering the period January 1 through March 31, 1967, he wrote, "Final Out of Business." However, he was still in the business of selling homes during the first 6 months of that year. During 1967, he sold 4 homes, which had been paid for and constructed in 1966 at a cost of $37,870.84. He offered no evidence to establish that he did not deduct such construction costs in 1966 in accordance with his accounting method, but he now claims that such construction costs are allowable deductions in 1967. During 1967, the petitioner paid or incurred the following expenses in connection with his business of selling homes which have not been allowed by the Commissioner: Telephone (6 months @ $12)
$ 72.00
Electricity (6 months @ $10)
60.00
Office supplies - postage, etc.
100.00
Advertising - Taunton Gazette
50.00
Insurance
100.00
Depreciation on office for 6 months
250.00
Total
$632.00
OPINION *100 To compute the petitioner's income from his construction business, we must decide the matters still at issue: a.The Cost of 11 Dean Street
The petitioner has the burden of persuading us that he did not deduct the cost of the Dean Street foreclosure property, and he has carried that burden. Interstate Transit Lines v. Commissioner,319 U.S. 590, 593 (1943). On this issue, we found the testimony of the petitioner to be credible and consistent with his general method of accounting for such costs. Accordingly, we hold that he is entitled to an additional business deduction in 1965 in the amount of $10,025. b. Commissions to Mr. Menoche in 1965 and 1966
The Commissioner stipulated that the commissions were paid to Mr. Menoche in 1965 and 1966 in connection with the sale of homes on behalf of the petitioner, and the petitioner testified that he never deducted these amounts in the years paid. The Commissioner never disputed such testimony or even questioned the petitioner with respect to it. The Commissioner first questioned this deduction in his brief on the ground that he has not been able to determine from the evidence whether the petitioner deducted such amounts on his schedule *101 C for such years. We think the Commissioner waited too long to raise such question. In view of the petitioner's testimony and the fact that the Commissioner never questioned him with regard to it at the trial, we hold that the petitioner is allowed additional deductions in 1965 of $1,602.50 and in 1966 of $3,261.00. c. Repairs of Winthrop Street and Highland Street Properties
The petitioner has failed to convince us that he is entitled to any additional deductions for 1965 and 1966 by reason of the repairs to the Winthrop Street and Highland Street properties. In the first place, he admits that the repairs to the Winthrop property may have been made in 1964, a year not before us, and if they were, they were deductible in that year in accordance with his method of accounting. In addition, the costs of any repairs to the two properties paid in 1965 and 1966 were deductible in those years in accordance with his method of accounting, and he has given us no reason to believe that he did not deduct such expenses in those years.Although he seeks to explain his failure to produce records to support his claims with respect to these items, he was able to obtain copies of records to support *102 his claimed deductions with respect to many other items at issue. In view of these circumstances, we hold that the petitioner is not entitled to any additional deductions with respect to the repairs of the Winthrop and Highland Street properties. d. Note from the Daleys
The petitioner claims that he is entitled to a bad debt deduction of $700 in 1966 because the note from the Daleys became worthless in such year, but he has failed to prove his right to such deduction.
Section 166(a)(1) provides that "[there] shall be allowed as a deduction any debt which becomes worthless within the taxable year." Normally, in order for a creditor to establish that a debt has become worthless, he must prove that he made every reasonable effort to locate the debtor and to collect the debt. Allen-Bradley Co. v. Commissioner,112 F. 2d 333, 334-335 (7th Cir. 1940), affg. 39 B.T.A. 1243 (1939); A. Finkenberg's Sons, Inc.,17 T.C. 973, 984 (1951); Walter J. Runyon,8 T.C. 350, 357 (1947); Maude Enella Brickell,17 B.T.A. 711, 712-713 (1929). However, if the creditor can establish that the debtor's financial position was such that attempts to collect would have been useless, then the creditor is excused *103 from collection activities, since the law does not require a creditor to engage in futile acts. Sec. 1.166-2(b), Income Tax Regs. ; Kate Baker Sherman,18 T.C. 746, 752 (1952); American Warehouse Co.,19 B.T.A. 8, 11-12 (1930); Cornelia Ann Cunningham, Executrix,16 B.T.A. 244, 247-248 (1929). The petitioner admits that he has never made any effort to collect from the Daleys, and he has failed to offer any evidence to establish that collection efforts would have been futile. Under these circumstances, it is very clear that the petitioner has completely failed to establish that the note from the Daleys became worthless in 1966 or in any other year before the Court, and we so hold.
e. Costs of the Bay Acres Homesites
It is quite clear that the petitioner would be receiving a double deduction for the costs of the Bay Acres homesites if the Commissioner's allowance of $14,031.25 in 1966 is permitted to stand.The petitioner testified that in 1965 and 1966, he charged off an allocable portion of the purchase price of the Bay Acres as he sold each homestite, and such practice is in accordance with his method of accounting. The Commissioner does not challenge those deductions and agrees *104 that the petitioner is entitled to deduct an allocable portion of such costs attributable to the homesites sold in 1967. Accordingly, although the Commissioner has the burden of proving that the petitioner is not entitled to the $14,031.25 deduction for 1966, he has carried that burden, and we hold that such deduction is not allowable. There remains a dispute as to the amount deductible by the petitioner as a result of the sale of three of the Bay Acres homesites in 1967. Although the Commissioner proposed to allow a lesser amount, we have found that $1,000 is allocable to each homesite. We reach such conclusion by adding the cost of surveying such property and the cost of purchasing it. Consequently, we hold that he is entitled to deduct $3,000 in 1967 by reason of the sale of three of the Bay Acre homesites in that year. f. Construction and Other Costs Claimed by Petitioner for 1967
In 1967, the petitioner sold four homes constructed by him in 1966 and argues that he should be allowed additional deductions in 1967 for the costs of constructing such homes, but he has failed to convince us he is entitled to such additional deductions.We have found that it was his method of accounting *105 to deduct such costs when paid, and no attempt has been made by the petitioner to secure the Commissioner's approval of a change in his accounting method. Under such method, the costs of constructing such homes were deductible in 1966, and not 1967. [2] *106 The petitioner has offered no evidence indicating that he did not in fact deduct such costs in 1966.Consequently, we hold that the petitioner is not entitled to any additional deductions by reason of the costs of constructing the four homes. However, we have found and hold that he is entitled to deduct certain business expenses set forth in our findings of fact. 2. Income from Hanson Investment Co., Inc.
FINDINGS OF FACT Hanson Investment Co., Inc. (Hanson Investment), was a corporation established under the laws of Massachusetts with its usual place of business in Hanson, Mass. In 1966, the petitioner and Howard E. Mowry, Jr., each owned 499 shares of the corporation, and their wives each owned 1 share of the corporation's stock. The principal asset of Hanson Investment was a building at 968 Washington Street, Hanson, Mass., which it leased to Hanson Porcelain Co., Inc. (Hanson Porcelain), for the conduct of its business. The petitioner and Mr. Mowry decided to eliminate the ownership interests of their *107 wives in Hanson Investment by transferring the assets of the corporation to the petitioner and Mr. Mowry. Accordingly, on December 24, 1966, Hanson Investment conveyed the building to the petitioner and Mr. Mowry, as joint tenants, for no consideration but subject to a mortgage then outstanding on the property. The Commissioner has determined that the fair market value of the building, free of any encumbrances, on the date of its conveyance was $47,450.00, and that the mortgage to which the building was subject was in the amount of $15,216.05. Thus, according to the Commissioner's computations, the building had a net equity of $32,233.95. He further determined that the petitioner and Mr. Mowry also received, in 1966, cash upon the liquidation of Hanson Investment in the amount of $3,221.38, which was distributed equally between them. The Commissioner made no allowance for any basis the petitioner may have had in his Hanson Investment stock; nor has the petitioner offered any evidence as to his basis in such stock. Consequently, the Commissioner determined that the petitioner had a long-term capital gain upon the liquidation of Hanson Investment of $17,727.67, consisting of one-half *108 of the net equity in the building and one-half of the cash distribution. The petitioner and Mr. Mowry were unaware that the liquidation of Hanson Investment resulted in taxable income to them. From their point of view, everything continued just as before; the building was still being leased to Hanson Porcelain. The only change of which they were aware was that the name of Hanson Investment was deleted from the land records in the Plymouth, Mass., Registry. The petitioner and Mr. Mowry continued the business previously conducted by Hanson Investment as a partnership under the name of Hanson Investment Co. (the partnership). The Commissioner determined that the partnership in 1967 had distributable income in the amount of $2,965.92 and that the petitioner's distributable share of the partnership income was $1,482.96, which he did not report on his 1967 Federal income tax return. On March 24, 1967, the building which the partnership leased to Hanson Porcelain was totally destroyed by fire. The petitioner claims that at the time of the fire, the building and its contents had a fair market value of $81,000. They were insured for that amount by seven different insurance policies, *109 and the petitioner and Mr. Mowry received $65,000 as insurance proceeds under such policies. The petitioner took no deduction on his 1967 Federal income tax return as a consequence of the destruction of the building owned by the partnership. OPINION The petitioner has the burden of proving that he is not taxable on the gain which the Commissioner determined he received as a result of the liquidation of Hanson Investment and that he is not taxable on the partnership income which the Commissioner determined he received in 1967. Mortimer L. Schultz,59 T.C. 559, 566 (1973); Estate of Dorothy E. Beck,56 T.C. 297, 374 (1971); Estate of Ralph B. Campbell,56 T.C. 1, 11 (1971). The petitioner has furnished no evidence to carry his burden of proof with respect to these matters, and accordingly, we sustain the Commissioner's determination with respect to them. The petitioner also has the burden of proving that he is entitled to a deduction by reason of the destruction of the building at 968 Washington Street. Burnet v. Houston,283 U.S. 223, 227 (1931). Section 165(a) allows a deduction for a loss sustained during the taxable year and not compensated for by insurance or otherwise. Such *110 provision is applicable to losses arising in connection with property used in a trade or business, and the amount thereof is computed by reference to the basis of the property. Sec. 165(b); sec. 1.165-7(b)(1), Income Tax Regs.
It is admitted that the building on the Washington Street property was destroyed and that such building was used in a trade or business. However, the Commissioner determined that the value of the building was $47,450 approximately 3 months prior to the fire. The petitioner claimed that the building and its contents were valued at $81,000 for purposes of the fire insurance, but his testimony was confusing and failed to convince us that the actual value of the building exceeded that determined by the Commissioner. In addition, $65,000 was paid by the insurance companies as a result of the fire, and in the light of this record, we are not convinced that the petitioner sustained a loss which was not compensated for by insurance. Thus, we hold that he is not entitled to any deduction by reason of the destruction of the Washington Street property. 3. Income from 26 Pleasant Street
FINDINGS OF FACT The Commissioner determined that in 1967, the petitioner had *111 an unreported profit from his rental of 26 Pleasant Street, Taunton, Mass., in the amount of $1,173.21, which he calculated as follows: Gross receipts
$2,769.21
Less: Utilities, taxes, mis-
cellaneous expenses,
and repairs
1,596.00
Depreciation
0
Net rental profit
$1,173.21
In 1967, the petitioner sold 26 Pleasant Street for $24,500.00 but did not report the sale on his Federal income tax return for that year. The Commissioner has determined that the petitioner realized $31,037.29 of longterm capital gain as a result of such sale, computed as follows: Selling price
$24,500.00
Less: Expense of sale
62.71
Balance
$24,437.29
Less: Cost basis
0
Gain on sale
$24,437.29
Add: Depreciation erroneously
allowed in prior years
6,600.00
Taxable income
$31,037.29
In 1954, the petitioner acquired 26 Pleasant Street together with 2 other properties in Taunton, Mass., 69 Washington Street and 82 Washington Street, at a total cost of $37,500, as indicated by revenue stamps attached to the deed conveying such properties. Eighty-two Washington Street was sold in 1964, and in computing the gain reported on such sale, the petitioner allocated to that property $17,401 of the aggregate cost of the 3 properties. He also sold 69 *112 Washington Street in that year but did not report the transaction. Since that property was sold for $17,000, and since he had claimed depreciation in excess of $3,000 on such property, the Commissioner allocated the remaining $20,000 of the cost of the 3 properties to 69 Washington Street. Consequently, according to the Commissioner's computations, the petitioner is not entitled to claim any basis in connection with the rental or sale of the Pleasant Street property, and the depreciation claimed by him in past years was not allowable. The petitioner disputes the Commissioner's computations, and claims that he has made additional expenditures in connection with the Pleasant Street property which should be included in his basis. He claims that when he purchased the properties in 1954, his total costs were $50,000, including $12,500 for the furnishings in the buildings. He also claims to have spent $5,700 over the years since 1954 replacing such furnishings. In addition, he claims to have spent $5,000 in 1963 for the construction of an office on the Pleasant Street property with respect to which he claimed an allowance for depreciation of $900 before 1967. Finally, in 1967, his *113 costs of selling the Pleasant Street property were $418.73. OPINION The petitioner reported no income from the rental of the Pleasant Street property in 1967, nor did he report any gain from its sale in that year; he has the burden of proving that he did not receive the income or gain determined by the Commissioner. Mortimer L. Schultz,59 T.C. 559, 566 (1973); Estate of Dorothy E. Beck, 56 T.C. 297, 374 (1971); Estate of Ralph B. Campbell, 56 T.C. 1, 11 (1971). The petitioner disputes the Commissioner's computation of unreported rental income for 1967 in only one respect: he claims an additional deduction of $800 as compensation paid to Mr. Menoche for management services, which consisted principally of collecting rents from the tenants of the apartment house. Although we are satisfied that he did make some payments to Mr. Menoche for such management services, the petitioner has failed to carry his burden of proving that the amount of compensation paid was $800. He offered no evidence besides his testimony to support his claim, and such amount seems excessive considering the services performed by Mr. Menoche and that the total amount of the rents collected was less than $3,000.Accordingly, *114 using our best judgment under the rule of Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930), we hold that the petitioner is entitled to an additional deduction of $300 as a management expense. In computing the basis of the Pleasant Street property, for purposes of determining the income realized by the petitioner on its sale, he has convinced us that there should be some adjustments in the basis determined by the Commissioner. Although the petitioner disagrees with the amount of basis the Commissioner allocated to 69 Washington Street, he has furnished no evidence or specific reasons to support his position, and under the circumstances, we think that the Commissioner was reasonable in determining that $20,000 of such costs were allocable to such property and that none of the original cost is allocable to the Pleasant Street property. However, we found the petitioner's testimony convincing that he had paid something for the original furnishings in the properties and that he had spent additional funds to replace those furnishings over the years. Yet, he failed to establish that the costs of the original furnishings may not have been fully depreciated by 1967 and failed to establish *115 the precise amount spent to replace those furnishings and the extent to which those additional costs may have been recovered by depreciation before 1967. Since we are convinced that he spent something for furnishings in the buildings, we hold, using our best judgment, that his basis in the Pleasant Street property should be increased by $2,000 to take account of such furnishings. Cohan v. Commissioner,supra.We are also satisfied that the petitioner constructed an office in 1963 and that an adjustment to his basis should be made for it, but we are not altogether convinced by his testimony as to its depreciated basis. Using our best judgment, we hold that the petitioner is entitled to a $3,000 addition to his basis by reason of the construction of the office. Finally, we accept his testimony that he incurred costs of $418.73 for selling the property and hold that such amount should be taken into consideration in computing his gain. 4. Alimony and Certain Other Payments
FINDINGS OF FACT The petitioner married his first wife, Althea Hall (Althea), in 1942, and they were divorced in 1967. The decree of divorce incorporated an agreement between the petitioner and Althea providing *116 that the petitioner shall pay Althea $75 a week for her support until she remarries. He paid Althea $3,375 in 1967 but did not deduct such amount for that year. The Commissioner, in his notice of deficiency for 1967, has determined that the petitioner is entitled to a deduction for such amount. Early in 1968, the petitioner unilaterally reduced the alimony payments to Althea to $50 a week, until the end of March 1968, when he stopped the payments altogether. During that time, he paid her a total of $650, which he did not deduct on his 1968 Federal income tax return. The Commissioner, in his notice of deficiency for 1968, has determined that such amount is deductible. In November 1968, Althea obtained a judgment for back alimony against the petitioner. Shortly thereafter, he contacted her and unsuccessfully tried to reach a compromise on his past-due alimony obligations. Althea believes that after those negotiations failed, she was not contacted by the petitioner again until the latter part of January 1971, and she is quite sure that she never heard from him between November 1, 1970, and late January 1971. The petitioner met with Althea on January 21, 1971, and they reached an *117 agreement with respect to his alimony obligations. She agreed to accept $11,050 as a complete settlement of his alimony arrearages, and it was agreed that he need not make any further support payments to her. The petitioner had Althea type this settlement agreement and told her to date it December 29, 1970.On January 21, 1971, he gave her a check for $925, which he had her prepare and date December 29, 1970. He did not tell her why he wanted both the check and the agreement dated December 29, 1970. On January 23 or 24, 1971, Althea received through the mail a certificate of deposit for $10,125 dated November 19, 1970. On the petitioner's 1970 Federal income tax return, he claimed an alimony deduction of $11,050.He told his accountant who prepared his 1970 Federal income tax return that he had paid the $11,050 in 1970. In early 1971, the petitioner was contacted by agents of the Commissioner, and on October 20, 1972, the petitioner had a conference with attorneys for the Commissioner. He told them that he made the alimony payments to Althea pursuant to a court decision handed down on December 29, 1970, and that he paid her $925 on that date and the remainder in 1971. He stated, *118 however, that his wife did not cash the check until January 1971. Paragraph 2 of the divorce agreement between the petitioner and Althea reads as follows: 2. George S. Hall agrees to pay Althea Hall the sum of Twenty Five Thousand and no/100 ($25,000.00) Dollars, Eleven Thousand and no/100 ($11,000.00) Dollars of which is to be paid forthwith and the balance of Fourteen Thousand and no/100 ($14,000.00) Dollars is to be paid on or before March 20, 1967, together with interest in the amount of Seventy Five and no/100 ($75.00) Dollars. It is understood that the sale proceeds from a five-room home situated on Broadway in said Raynham (Lots 7A and 5A) and owned by the parties as tenants by the entirety will be used to satisfy this obligation of George S. Hall. The divorce agreement made no provision for the sale or division of 602 Elm Street, Raynham, Mass., which had been the residence of the petitioner and Althea during their last years of marriage and was owned by them jointly. Paragraph 9 of the divorce agreement provided that the agreement "constitutes a settlement of all property rights between the parties, insofar as the law allows." In accordance with paragraph 2 of the divorce *119 agreement, the petitioner paid Althea $11,000 on February 13, 1967. However, because he experienced difficulty in selling the Broadway home, he was not able to pay the additional $14,075 owing under paragraph 2 of the divorce agreement on or before March 20, 1967. Instead, in June 1967, he sold 602 Elm Street for $32,000.00. His costs of sale were $2,827.68, so that the net proceeds from the sale were $29,172.32. Althea's signature was necessary before the sale of the residence could be effectuated. She signed the necessary papers, and on the same day, the petitioner paid her $14,140. The Broadway property was sold in October 1967, and Althea received none of the proceeds from its sale.Nor has she ever received her share of the proceeds from the sale of the Elm Street property. In less than a year after the sale of the Elm Street property, the petitioner had constructed a new residence on Timberlake Drive in Lynchburg, Va., which he then occupied and used as his residence. The cost of his new home was $17,500.81. Approximately one month before the trial of this case, the petitioner sent to Althea an affidavit prepared by him and requested her to sign it. The affidavit recited *120 that Althea received $14,140 as a tenant in common upon the sale of 602 Elm Street, and that within one year she purchased a new home with such funds.The affidavit also recited that she received $11,050 on December 29, 1970, as final payment under the divorce decree. Althea refused to sign the affidavit because to her knowledge, she never received any proceeds from the sale of 602 Elm Street, and she did not purchase her new home with such funds. Moreover, she disagreed with the recital in the affidavit that she received the $11,050 on December 29, 1970. The petitioner testified that had Althea signed the affidavit, he would have submitted it to the Government and asked that they stipulate to its truth, and he would also have presented it to the Court. The petitioner and Althea now agree that after the execution of the divorce agreement, she was entitled to receive $14,000 from the proceeds of the sale of the Broadway property and one-half of the proceeds of the sale of the Elm Street property and that she has never received any of the proceeds of the Elm Street property. Subsequent to the divorce between the petitioner and Althea, he married June Mallette. He and June Mallette *121 Hall (June) separated around the end of 1968, and June instituted legal proceedings against him which eventually resulted in a divorce. The petitioner made alimony payments to June in 1968 of $300 and in 1969 of $600. He did not deduct such payments, and the Commissioner has determined that he is entitled to deduct them. The only other payment made by the petitioner to June as a consequence of their divorce was a lump-sum payment of $6,000 in June 1969, which he claimed represented alimony for one year at a weekly rate of $120. OPINION a. Alimony Payments to Althea
The parties now agree that the petitioner is entitled to deduct the alimony payments made to Althea in 1967 and 1968. Sec. 215. In his return for 1970, the petitioner claimed a deduction for the payments made to Althea in 1971, but he now concedes that such payments are not deductible for 1970. b. Other Payments to Althea
The Commissioner takes the position that the petitioner is taxable on the net proceeds of the sale of the Elm Street property, and he presents two theories to support that position. In the first place, he argues that as a result of the divorce agreement, Althea relinquished her interest in such *122 property so that the petitioner became entitled to the entire proceeds on its sale. In the alternative, the Commissioner argues that if Althea was entitled to a share of such proceeds, the petitioner has never paid them to her, and therefore, he is taxable on such amount under the claim of right doctrine. To resolve this matter, we must decide what were the rights of Althea after the execution of the divorce agreement. That agreement contains no provision dealing specifically with Althea's rights with respect to the Elm Street property, but the Commissioner argues that as a result of paragraph 9 of that agreement, she relinquished her claims to that property. We do not agree with that interpretation. Paragraph 9 is nothing more than a general release, and there is no indication that it was intended to affect Althea's rights to the Elm Street property which were not the subject of the divorce agreement. Moreover, if that provision is considered to affect either party's rights to the Elm Street property, it could as easily be read to mean the petitioner was relinquishing his interest in that property. Although the parties to the divorce agreement have vacillated as to its intent, *123 they now both agree that such agreement was not intended to affect Althea's rights to the Elm Street property. In the light of these circumstances, we hold that after the divorce agreement, Althea continued to be entitled to one-half of the proceeds of the sale of the Elm Street property. The petitioner contends that he used his share of the proceeds of that sale to purchase a new residence and that he qualifies for the nonrecognition treatment of section 1034, which allows a taxpayer not to recognize the gain on the sale of a residence if certain requirements are satisfied. [3] *125 Under that section, if the adjusted sales price of his old residence is entirely reinvested in the purchase of the new residence and the other requirements are satisfied, no gain is recognized. Since we have found that the petitioner was entitled to only one-half of the proceeds of the sale of the Elm Street property, his adjusted sales price for that property was $14,586.16, and since he paid more than that amount to construct his new residence, he has satisfied that requirement. Although the Commissioner argued that the petitioner had not purchased his new residence in sufficient time to qualify under *124 section 1034, we have found that he purchased and commenced using his new residence within one year after selling the Elm Street property. The Commissioner does not contend that the petitioner failed to meet any of the other requirements of section 1034, and consequently, we hold that he does qualify under section 1034. In our judgment, there is merit to the Commissioner's alternative position. We have found that Althea had a right to a share of the proceeds of the sale of the Elm Street property and that the petitioner never paid her such proceeds. We have also found that the payment which he did make to her in June of 1967 was made pursuant to her right under the divorce agreement to receive a share of the proceeds of the sale of the Broadway Street property. Thus, we have found that the petitioner has retained funds which did not belong to him. He has exercised control and dominion over such funds, and even though Althea may have a claim against him, he is taxable on such funds under the claim of right doctrine.See, e.g., North American Oil Consolidated v. Burnet,286 U.S. 417 (1932); Whitaker v. Commissioner,259 F. 2d 379 (5th Cir. 1958), affg. 27 T.C. 399 (1956); R.A. Stewart & Co.,57 T.C. 122 (1971); cf. sec. 1341 (a) (1). The Commissioner determined that the petitioner was taxable on Althea's share of the gain as a long-term capital gain, and since no issue has been raised as to the manner of taxation of such gain, we sustain the determination. *126 c. Alimony Payments to June
The only controversy concerning the payments to June is whether the petitioner is entitled to deduct the $6,000 payment made to her in 1969. To be entitled to deduct such payment under section 215, [4] the petitioner must establish that the payment is includable in the gross income of June under section 71, and he has failed to do so. Section 71 only includes in the wife's income alimony payments which are periodic payments, made by the husband on account of the "marital or family relationship," pursuant to a decree of support, separate maintenance, or divorce, or under a written separation or divorce agreement. The petitioner has not established that the $6,000 was paid under a court decree or pursuant to a written instrument incident to his separation or divorce. He has not introduced into evidence a divorce decree or a written agreement which obligated him to make the $6,000 *127 payment, nor has he testified that either existed and required him to make the payment. He testified merely that he and June agreed on this $6,000 payment, but such testimony establishes, at most, an oral agreement under which he was obligated to make the payment. However, the payment of alimony pursuant to an oral agreement is not sufficient to comply with sections 71 and 215. Sec. 1.71-1(b)(1), (2), (3), Income Tax Regs.; Mack R.Herring,66 T.C. 308 (1976); cf. George R. Joslyn,23 T.C. 126, 137 (1954), revd. in part and affd. in part on other grounds 230 F. 2d 871 (7th Cir. 1956).Moreover, the payment was a lump-sum payment, and not a periodic payment as required by section 71(a). See sec. 71(c); Martha P. Pierce,66 T.C. 840 (1976). No effort has been made to qualify such payment under section 1.71-1(d) (3), Income Tax Regulations, relating to alimony payments subject to a contingency. Consequently, we hold that the $6,000 payment to June is not deductible. 5.Interest Income
FINDINGS OF FACT During 1965 through 1970, the petitioner maintained numerous bank accounts in the United States and one in Canada, including some joint accounts. One such account was maintained in *128 the Greater Arizona Savings and Loan Association (Greater Arizona). On his returns for such years, the petitioner reported the interest from some of such accounts, but the Commissioner has determined that he was taxable on additional unreported interest, including interest on some accounts solely in the names of others. The petitioner now agrees that he was taxable on the Greater Arizona and certain other accounts, but he disputes his ownership of one of the accounts. The amount of interest reported by him, the amount of unreported interest on the Greater Arizona account, the additional interest which he now concedes is taxable to him (including that from the Greater Arizona account), and the amount of interest still in dispute are set forth in the following table: Unreported
Interest from
Conceded
Amount Year
Reported by P
Greater Arizona
Understatement
in Dispute
1965
$1,204.79 a
$317.11
$ 269.17
0
1966
770.32
358.13
394.48
0
1967
127.50
370.58
3,011.26
$ 35.42
1968
146.35
249.75
4,440.48
256.26
1969
79.43
12.92
6,702.02
250.00
1970
9,430.28
0
839.41
100.00
The interest still indispute was paid on savings account No. XXXX in the Cooperative Building and *129 Loan Association, Inc., of Lynchburg, Va., in the name of the petitioner and Inez O. Johnson (Inez). All the funds in that account were provided by him, and Inez had no control over it: he decided who would receive the interest income from the account. Consequently, the interest income for such account belonged to the petitioner, even though he made a gift of it to Inez during the years 1967 and 1968. The petitioner was aware of his obligation to report all of his interest income on his Federal income tax returns. The evidence reveals that for the years 1965 and 1966, all of the petitioner's bank accounts were held jointly with Althea or with Almira Hall, his mother. The record reveals that during 1965 and 1966, the petitioner maintained only two joint bank accounts with his mother--one at Taunton Co-operative Bank, Taunton, Mass., and the other at Greater Arizona, but there is no indication that he received any interest on the Taunton account in 1965. The petitioner reported the interest income from such account during 1966, but he reported no interest income from Greater Arizona in 1965 or 1966, or for any subsequent year in issue except 1970. During the years 1967 through *130 1970, he maintained numerous bank accounts jointly with either his father, sister, son, or a friend. In a number of cases during 1967 through 1970, he had his relatives hold his bank accounts solely in their names, and he did not report the income on such accounts. The petitioner's explanation for his failure to report interest income from his Greater Arizona account during the years 1965 through 1969 was that he regarded this savings account as a "losing account" because the bank had been put into receivership in 1959 at a time when the petitioner had $9,804.15 on deposit. He was informed by the bank that he would lose approximately 40 to 70 percent of his account balance. He received a final statement of the amount of his loss in 1968, which turned out to be $1,897.57. He did not deduct such loss on his 1968 Federal income tax return, but he testified that he took account of such loss by offsetting it against a longterm capital gain of $1,783.30 realized on the sale of 1,000 shares of General Telephone and Electronics stock. OPINION The only issue concerning interest income to be decided by us is whether the petitioner is taxable on the interest earned by the account in the *131 Cooperative Building and Loan Association, Inc., of Lynchburg, Va., in the name of him and Inez. He argued that Inez received the interest from the account during the years 1967 and 1968, and consequently, she is taxable on such income. However, it is well established that the owner of an income-producing asset cannot merely assign by gift the income from such property, while still retaining the underlying property, and avoid taxation on such income. Helvering v. Horst,311 U.S. 112 (1940). The record indicated that the petitioner provided the funds deposited in the account and controlled it. Consequently, we have found that he was the owner of the account, and we hold that he is taxable on the interest produced by it. 6. Salary Paid to Charles
FINDINGS OF FACT The petitioner and Mr. Mowry were each 50-percent shareholders of Hanson Porcelain, which had its principal place of business in Hanson, Mass. They were both officers of the corporation and had agreed that each should receive a weekly salary of $700.Sometime in 1968, the petitioner instructed an employee of Hanson Porcelain to stop making salary payments to him, and instead, to make them to his father, Charles S. Hall *132 (Charles). Pursuant to this arrangement, Charles was paid $1,000 in 1968 and $20,670 in 1969.While the payments were made to Charles, the petitioner continued his services for Hanson Porcelain but received no salary payments for such services. Charles had no experience in the business of Hanson Porcelain and performed no services for it, although he had been listed as a director of the corporation. The salary checks to Charles were endorsed by the petitioner pursuant to a power of attorney which he held, and deposited in the petitioner's personal bank accounts.They were disbursed to Charles as he needed funds. It is possible that the petitioner used some of the proceeds from these checks for personal uses, although he believes that his father received all of these funds over a period of time in various forms. Sometime in 1969, the petitioner had Hanson Porcelain discontinue making such payments to Charles because the petitioner was informed by his accountant that such payments could be questioned by the Internal Revenue Service. No Federal income tax return was filed on behalf of Charles for 1968, because the petitioner understood that Charles' only income was the $1,000 received *133 from Hanson Porcelain and that his exemptions far exceeded that amount. However, the petitioner did prepare and file a return on behalf of Charles for 1969 in which he reported the $20,670. The petitioner paid the tax due on such return by a check drawn on the petitioner's bank account. OPINION The Commissioner determined that the salary paid by Hanson Porcelain to Charles in 1968 and 1969 was earned by the petitioner and taxable to him. The facts overwhelmingly support the Commissioner's determination. They indicate that such salary was earned for the services performed by the petitioner and that Charles performed no services to earn such salary. The petitioner asserts that the payments were made to Charles to avoid any claims that might be made against them by Althea, that the arrangement was made to provide support for Charles, and that tax was paid on the salary in the name of Charles. These facts, even if true, do not affect the taxability of the salary payments. We hold that since the salary payments were earned by the petitioner, they are taxable to him. Lucas v. Earl,281 U.S. 111 (1930). 7. Constructive Dividends
FINDINGS OF FACT The Commissioner determined that the *134 petitioner received constructive dividends during the years 1967 through 1969 from Hanson Porcelain as a result of the following payments made to him or on his behalf, or as a consequence of the following personal use he made of corporate property: 1967
1968
1969
1. Corporate expenses incident
$ 379.91
$ 830.37
$ 644.98
to petitioner's personal
use of corporate automobile
2. Life insurance premiums
1,536.00
0
0
3. Long distance phone calls,
187.22
270.79
221.13
entertainment, and
country club dues
4. Airline travel
0
265.80
218.09
5. Legal expense
0
0
1,067.43
The petitioner was the insured on a life insurance policy with Nationwide Life Insurance Co. The premiums on such policy were paid on behalf of the petitioner by Hanson Porcelain, which paid similar life insurance premiums for Mr. Mowry. During 1967, Hanson Porcelain made premium payments on behalf of the petitioner in the amount of $1,536.00, which the petitioner did not report on his 1967 Federal income tax return. During the years 1967 through 1969, the petitioner was furnished a car by Hanson Porcelain, which he used for business and personal uses. The Commissioner determined that the petitioner used the car 30.5 percent for personal use and *135 69.5 percent for business use. The petitioner testified that he would estimate his personal use of the car to be only 10 percent, but he presented no records or other evidence to establish the extent of his personal usage of the corporate automobile. In 1969, the petitioner and Mr. Mowry transferred their stock holdings in Hanson Porcelain to Walter E. Heller International and received, in exchange, stock in Walter E. Heller International. In connection with such exchange, the petitioner and Mr. Mowry engaged the legal services of the attorney used by Hanson Porcelain, which paid him $2,134.86 for such services. The Commissioner determined that 50 percent of such payment by Hanson Porcelain, or $1,067.43, constituted a dividend to the petitioner. The petitioner challenges the Commissioner's determination with respect to the costs of air travel, the long distance phone calls, entertainment, and country club dues, paid by the corporation, but he presented no records or other evidence to refute the Commissioner's determination. OPINION The law is well settled that if a corporation makes a payment to a shareholder, or on his behalf, or allows a shareholder to use corporate facilities, *136 then such payment or the fair market value of the use of such corporate facilities constitutes a constructive dividend to such shareholder. John L. Ashby,50 T.C. 409, 417 (1968); Challenge Manufacturing Co.,37 T.C. 650, 663 (1962); Irving Sachs,32 T.C. 815, 820-821 (1959), affd. 277 F. 2d 879 (8th Cir. 1960), cert. denied 364 U.S. 833 (1960); American Properties, Inc.,28 T.C. 1100, 1114-1115 (1957), affd. per curiam 262 F. 2d 150 (9th Cir. 1958). The tax consequences of a constructive dividend to a shareholder are determined in the same manner as other dividends, i.e., under sections 301 and 316. Here, too, the petitioner has the burden of proving that he did not receive the constructive dividends determined by the Commissioner. John L. Ashby,supra;American Properties,Inc.,supra; cf. Walter K. Dean,57 T.C. 32, 43 (1971). a. Life Insurance Premium
The petitioner recognizes that in 1967 he received a constructive dividend by reason of the fact that Hanson Porcelain paid the premium in that year on the insurance policy on his life, but he argues that he reported such premium for tax purposes. In part, he relies upon a statement in the Commissioner's brief that the premium *137 has been included in the petitioner's income, but that statement merely indicates that the Commissioner has included the premium income for purposes of his computation. Moreover, we have examined the petitioner's tax return for 1967, and there is absolutely no indication that he reported the premium for tax purposes. For these reasons, we have found that the premium was not reported, and we hold that the petitioner is taxable on the amount thereof. b. Use of Car
In connection with the Commissioner's determination that the petitioner received a constructive dividend by reason of the fact that Hanson Porcelain provided him with the use of a car, his only contention is that his personal use was less than that determined by the Commissioner. However, the petitioner has the burden of proof, and since he offered no records or other convincing evidence to support his contention, we sustain the Commissioner's determination in this respect. c. Legal Fee
The petitioner argues that the legal fee paid by Hanson Porcelain incident to the exchange by the petitioner and Mr. Mowry of their Hanson Porcelain stock for Walter E. Heller International stock constitutes a business expense of Hanson *138 Porcelain and does not represent dividends to the shareholders. Whether the legal fee paid by Hanson Porcelain constitutes a constructive dividend turns on the factual question of whether the legal services were performed for the benefit of the shareholders or for the corporation. John L. Ashby,supra;Challenge Manufacturing Co.,supra;Irving Sachs,32 T.C. at 820-821; cf. J. Gordon Turnbull, Inc.,41 T.C. 358, 378 (1963); Royal Cotton Mill Co.,29 T.C. 761, 788 (1958); George D. Mann,33 B.T.A. 281, 290 (1935). The evidence indicates that the exchange of stock was a transaction conducted exclusively between the stockholders of Hanson Porcelain, on the one hand, and Walter E. Heller International, on the other. It does not appear that Hanson Porcelain was involved in the transaction at all. Accordingly, the payment by Hanson Porcelain of the legal fee represents a payment exclusively for the benefit of its shareholders and constitutes a constructive dividend to them, and we hold that the petitioner is taxable on his share of the dividend as determined by the Commissioner. d. Other Constructive Dividends
The petitioner contends that the entertainment expenses and country club *139 dues paid by Hanson Porcelain were not for his personal benefit. However, since he has presented no records or other evidence to support his contention or otherwise refute the Commissioner's determination with respect to the entertainment expenses, country club dues, telephone calls, and the costs of airline travel, paid by Hanson Porcelain, and since he has the burden of proving such determination to be incorrect, we sustain the Commissioner's determination. 8. Gain from Surrender and Cancellation of Insurance Policy
FINDINGS OF FACT In 1969, the petitioner and Mr. Mowry surrendered for cancellation their life insurance policies on which Hanson Porcelain paid the premiums. The cash surrender value paid by the insurance company on the petitioner's policy was $9,585.58, and the cash surrender value paid on Mr. Mowry's policy was $7,646.72. However, the petitioner and Mr. Mowry had agreed to split the proceeds from the policies evenly between them, since each of them was a 50-percent shareholder of Hanson Porcelain. Therefore, the petitioner's share of the proceeds of the two policies was $8,616.15. The Commissioner determined that the petitioner's basis in his policy was $3,962.27, *140 attributable to payments made by Hanson Porcelain during the years 1967 through 1969, and that the petitioner realized a gain of $5,623.31, the difference between the amount paid on his policy and its basis. OPINION Upon the surrender and cancellation of the petitioner's insurance policy, taxable income is realized if the cash surrender value is in excess of his basis in such policy. Sec. 61(a)(10); Frank J. Cobbs,39 B.T.A. 642 (1939); cf. Lucas v. Alexander,279 U.S. 573 (1929); compare sec. 1035. The only dispute on this issue concerns the amount of taxable income realized by the petitioner. The question is whether the gain should be computed by reference to the $9,585.58 paid with respect to the petitioner's policy or by reference to the $8,616.15 which was the petitioner's share of the proceeds of both of the policies. The petitioner's position seems to be premised on the theory that Hanson Porcelain owned the policies, and that when all of the proceeds were collected, the corporation made a distribution to its shareholders. However, the facts of record do not support such theory. They indicate that the petitioner was the owner of his policy and that as such, he was entitled *141 to all the proceeds paid on its surrender and cancellation. There is no indication that Mr. Mowry had any ownership interest in the petitioner's policy nor that the agreement between the two of them was legally enforceable or anything other than a private understanding. In the light of these circumstances, we hold that the petitioner was entitled to the entire proceeds on his policy and that such amount should be used in computing his gain. See Frank J. Cobbs,supra; cf. Lucas v. Alexander,supra.
9. Rental Income from Car Leasing
FINDINGS OF FACT For the years 1969 and 1970, the petitioner leased his car to Hanson Porcelain. The Commissioner determined that the petitioner made a net profit of $294.72 from such activity in 1969, which he did not report on his return for such year. The Commissioner also determined that in 1970, the petitioner made a net profit of $264.68 from the leasing transaction instead of a loss of $229.00 reported by him on his return for such year. In computing the expenses allowable to the petitioner in connection with the leasing of his car, the Commissioner determined that only 69.5 percent of such expenses were deductible, because 30.5 percent of *142 such expenses were attributable to his personal use of the car.
Although the petitioner disputes such adjustments, the only evidence offered by him was his estimate that his personal use of the car was limited to 10 percent; he offered no documents in support of such estimate. OPINION Since the petitioner has failed to produce any records or other convincing evidence to disprove the Commissioner's determination, we hold that he has failed to carry his burden of proving such determination to be erroneous and sustain the Commissioner's determination with respect to the deductibility of the expenses attributable to the leasing of the car. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). 10. Fraud
FINDINGS OF FACT On June 4, 1973, the petitioner was indicted on charges of violating section 7206(1) by willfully filing false income tax returns for the years 1969, 1970, and 1971. He entered a plea of not guilty to such charges. On August 23, 1973, after a trial on the merits, the jury rendered a verdict finding the petitioner guilty of violating section 7206(1) for the years 1968 and 1969, but found him not guilty of such charge for the *143 year 1970, and the court entered its judgment in accordance with the verdict. OPINION The Commissioner determined that the petitioner fraudulently underpaid his taxes for all the years 1965 through 1970. The Commissioner relies in part upon the petitioner's conviction under section 7206(1) for the years 1968 and 1969 to establish that he filed fraudulent returns for those years, but the Commissioner also takes the position that the other facts of record in this case establish fraudulent underpayments by the petitioner for all the years at issue.
Section 6653(b) in relevant part provides: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.* * * The burden of proving that part of the petitioner's underpayment for the years in issue was due to fraud is on the Commissioner. Sec. 7454(a). The Commissioner must prove fraud by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure; Archer v. Commissioner,227 F. 2d 270 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Blaine S. Fox,61 T.C. 704 (1974); *144 Anson Beaver,55 T.C. 85, 92 (1970). To establish fraud, the Commissioner must show that the taxpayer deliberately intended to evade the payment of taxes, which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. and remg. 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941); Fred N. Acker,26 T.C. 107, 112-113 (1956). The issue of fraud poses a factual question which is to be determined upon an examination of all the evidence in the record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Irolla v. United States,390 F. 2d 951, 953 (Ct. Cl. 1968); Tsuneo Otsuki,53 T.C. 96, 105-106 (1969). After weighing the evidence in this case, we are not convinced the petitioner's conduct was fraudulent in 1965 and 1966. In those years, he substantially understated his gross receipts from his business of constructing and selling *145 homes, but he also neglected to claim many deductions to which he was entitled. He also failed to report some interest in the years 1965 and 1966, but those omissions were relatively small--$269.17 in 1965 and $394.48 in 1966.Furthermore, substantially all of the omitted interest was earned on the Greater Arizona account, which he did not report because he claims he expected ultimately to lose money on the account. Although that excuse does not relieve him of the liability to pay taxes on such interest, it does have some bearing on whether his failure to report the interest was fraudulent. Finally, he did not report in 1966 a gain on the liquidation of Hanson Investment. As a matter of law, he was taxable on such gain, but his claim that the liquidation did not significantly change his relationship to the property and that he did not realize that the liquidation was a taxable event does have some merit. These circumstances show that the petitioner kept his records and computed his income in a haphazard and careless manner, but the evidence falls short of establishing clearly and convincingly that he had the specific intent to evade taxes. The Commissioner asserts that there were *146 substantial omissions of income in all of the years at issue and that for such reason, we should find fraud in each of such years. The failure to report substantial amounts of income over a period of years is evidence of fraud. Steiner v. Commissioner,350 F. 2d 217 (7th Cir. 1965), affg. a Memorandum Opinion of this Court; Schroeder v. Commissioner,291 F. 2d 649 (8th Cir. 1961), affg. a Memorandum Opinion of this Court; Lawrence Sunbrock,48 T.C. 55 (1967).Such rule is grounded upon the rationale that the repeated failure to report income properly indicates that the failure to report was not innocent. Yet, the circumstances in 1965 and 1966 appear to be significantly different than those in the subsequent years. In 1965, the omissions were relatively small, and when income is recomputed in accordance with our opinion, there is little, if any, deficiency for that year. Though the omissions in 1966 were greater, there are mitigating circumstances, and the events in that year do not appear to be a part of the pattern which developed in later years. For these reasons, we hold that the Commissioner has failed to prove that any underpayments for 1965 and 1966 were due to fraud. The *147 circumstances in 1967 through 1970 show an entirely different pattern. The magnitude of the omissions is greater, and the petitioner's explanations for his conduct are far less credible. In 1967, the petitioner failed to file a Schedule C and report the income from his construction business, although the net income from such business exceeded $38,000 in such year. He also filed a Form 941 fraudulently stating that he was no longer in business. Cf. Powell v. Granquist,252 F. 2d at 60; Barcott v. United States,169 F. 2d 929 (9th Cir. 1948), cert. denied 336 U.S. 912 (1949); Irolla v. United States,390 F. 2d at 955; Anson Beaver,55 T.C. at 93. In addition, he failed to report the rental income from the Pleasant Street property or the gain realized on its sale, although he had reported rental income from that property in a prior year. Finally, he attempted to mislead the Commissioner and this Court as to the disposition of the proceeds of the sale of the Elm Street property by requesting Althea to execute an affidavit which he knew to be incorrect. Cf. Powell v. Granquist,supra;Barcott v. United States,supra;Irolla v. United States,supra;Anson Beaver,supra.There is *148 no convincing explanation as to the failure to report these amounts of income, and the failure to report them, together with the attempts to mislead the IRS and this Court, provide clear and convincing evidence of fraud. The petitioner contends that his failure to report interest of over $3,000 is justified because he failed to claim alimony deductions for that year, but the evidence of fraud is clear irrespective of whether we accept his contention with respect to interest. For 1968, the evidence of fraud includes the conviction of the petitioner for having willfully filed a false return for that year. Cf. Cirillo v. Commissioner,314 F. 2d 478, 482 (3d Cir. 1963), affg. on this ground a Memorandum Opinion of this Court; Anson Beaver,55 T.C. at 93. In addition, in that year, he commenced the arrangement under which his salary was paid to his father. The petitioner argues that his purpose was to avoid the claims of Althea and June. Yet, the petitioner could have reported such income, notwithstanding the arrangement to have it paid to his father, and thus, the purported explanation fails to justify the failure to report the income. See Emilie Furnish Funk,29 T.C. 279, 293-294 (1957), *149 affd. on this ground sub nom. Furnish v. Commissioner,262 F. 2d 727 (9th Cir. 1958); Manson L. Reichert,19 T.C. 1027, 1039 (1953), affd. on other grounds 214 F. 2d 19 (7th Cir. 1954), cert. denied 348 U.S. 909 (1955); Coats v. United States,258 F. Supp. 1, 5-6 (E.D. Tex. 1966). Moreover, for 1968, he failed to report interest in excess of $4,600, some from accounts solely in the names of his relatives. His attempt to excuse such failure by claiming that the unreported interest was offset by the unclaimed alimony deductions is unconvincing, since the deductions amounted to only $950. These facts establish clearly a fraudulent purpose in 1968. See Emilie Furnish Funk,supra;Sam D. Hecht,16 T.C. 981, 987 (1951); Robert Burd,19 B.T.A. 734, 735-736 (1930); cf. Heyman v. Commissioner,176 F. 2d 389, 393-394 (2d Cir. 1949), affg. a Memorandum Opinion of this Court. The evidence of fraud in 1969 also includes the petitioner's conviction of willfully filing a false return for that year and the arrangement to have his salary paid to his father. The unreported interest in that year exceeded $6,900 and included interest from accounts solely in the names of some of his relatives. *150 The excuse that such unreported interest was offset by deductions to which he was entitled was not convincing.Such evidence establishes clearly that the petitioner's conduct was fraudulent in 1969. See Emilie Furnish Funk,supra;Sam D. Hecht,supra;Robert Burd,supra; cf. Heyman v. Commissioner,supra.We reach such conclusion without taking into consideration his failure to report the gain on the surrender of the insurance policy. The most egregious evidence of fraud was the petitioner's attempt to claim a deduction of $11,050 for alimony payments to Althea in 1970. He falsely claimed that he made such payments to her on December 29 of that year, although he never had any contact with her until the latter part of January 1971. When questioned by representatives of the Commissioner, he repeatedly misrepresented the facts. See Powell v. Granquist,252 F. 2d 56 (9th Cir. 1958); Barcott v. United States,169 F. 2d 929 (9th Cir. 1948); Irolla v. United States,390 F. 2d 951 (Ct. Cl. 1968); Anson Beaver,55 T.C. 85 (1970). He attempted to support his position by producing documents that had been backdated and were false. See Spies v. United States,317 U.S. 492, 499 (1943); United States v. Wilkins,385 F. 2d 465, 472 (4th Cir. 1967), *151 cert. denied 390 U.S. 951 (1968); Hicks Co.,56 T.C. 982, 1021, 1024 (1971); Maggio Brothers,6 T.C. 999, 1008-1009 (1946). In addition, he attempted to further his plan of deception by requesting Althea to execute a false affidavit. His claim that such conduct was justified because the alimony was payable for the period ending in 1970 was not sufficient to excuse such a program of deception. Such conduct clearly establishes fraud for 1970. Finally, not only do the transactions to which we have referred separately indicate fraud for the years 1967 through 1970, but they also, in the aggregate, constitute a pattern of underpayments of substantial amounts of tax, which support a finding of fraud. Steiner v. Commissioner,350 F. 2d 217 (7th Cir. 1965). Accordingly, we hold that the underpayments of tax for the years 1967 through 1970 were due to fraud. 11. Statute of Limitations
FINDINGS OF FACT The notices of deficiency in this case were mailed to the petitioner on March 21, 1973, for 1967, and on March 22, 1974, for 1965, 1966, 1968, 1969, and 1970. OPINION Section 6501(a) provides that, as a general rule, a deficiency may be assessed within 3 years after the filing of a return, *152 and if a notice of deficiency is mailed to a taxpayer within that time, the running of the statute of limitations is suspended. Sec. 6503; Whirlpool Corp.,61 T.C. 182 (1973). The Commissioner maintains that the statute of limitations has not run for any of the years at issue because of his claim that the petitioner's conduct was fraudulent in each of those years. Section 6501(c)(1) provides that if a fraudulent return is filed, the statute of limitations does not run for that year. The Commissioner's only argument against the running of the statute of limitations for 1965 and 1966 was the claim of fraud, and since we have found that the petitioner's conduct was not fraudulent in those years, the statute of limitations has run for those years.However, since we have also found that the petitioner's conduct was fraudulent for 1967 through 1970, the statute of limitations has not run for those years, and we need not consider the Commissioner's other grounds for arguing that the statute of limitations has not run for such years. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
a. Gross receipts represent total gross sales less various discounts given by the petitioner.↩
2. The parties have not raised the issue as to whether the method of accounting followed by the petitioner was proper; accordingly, we do not pass on that issue.However, even if such method was improper, and if under a proper method, 1967 would have been the proper year for the deduction of such costs, such facts would not help the petitioner because it has been held repeatedly, and the relevant regulations provide, that the Commissioner's consent is necessary before a taxpayer will be allowed to change from an improper method of accounting to a proper one. Sec. 1.446-1(e)(2), Income Tax Regs.; Witte v. Commissioner,513 F. 2d 391, 393-395 (D.C. Cir. 1975), revg. a Memorandum Opinion of this Court (improper to proper); American Can Co. v. Commissioner,317 F. 2d 604, 606 (2d Cir. 1963), cert. denied 375 U.S. 993 (1964); Commissioner v. O. Liquidating Corp.,292 F. 2d 225, 230-231 (3d Cir. 1961), revg. a Memorandum Opinion of this Court, cert. denied 368 U.S. 898 (1961); H. F. Campbell Co.,53 T.C. 439, 447-448 (1969), affd. 443 F. 2d 965 (6th Cir. 1971); cf. Korn Industries, Inc. v. United States,532 F. 2d 1352↩ (Ct. Cl. 1976).
3. Section 1034 in relevant part provided for the years at issue: (a) Nonrecognition of Gain.--If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence. (b) Adjusted Sales Price Defined.-- (1) In general.--For purposes of this section, the term "adjusted sales price" means the amount realized, reduced by the aggregate of the expenses for work performed on the old residence in order to assist in its sale.
4. Section 215 provides in relevant part: (a) General Rule.--In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. * * *↩
a. The petitioner overstated the interest on certain accounts.↩