MAGGIO BROS. CO. INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 111268, 1664, 5125.   Promulgated May 8, 1946.

*George Bouchard, Esq.*, for the petitioner.
*E. C. Crouter, Esq.*, for the respondent.

OPINION.

ARNOLD, *Judge*: Petitioner concedes that the returns for all the years involved overstated the amount of merchandise purchases, but contends that the amounts of the overstatements are properly deductible on the returns as representing additional salaries of the stockholders. The petitioner's stock was owned equally by seven individuals, six brothers and a brother-in-law. Each of the stockholders was a director and an employee of petitioner, devoted all his time to the business, and received the same salary as the other stockholders. Sam Maggio testified that in 1937 the stockholders were receiving salaries of $35 per week each, but found that they needed more money for living expenses, and that their bookkeeper devised the method of drawing cash for additional salaries and charging the amounts to merchandise purchases through the making of fictitious voucher entries showing the purchase of merchandise for cash or by issuing checks in payment of fictitious purchases of merchandise. The amounts paid each stockholder through this procedure are said to have been about $35 per week and were in addition to the regular salaries of $35 per week drawn by each and the annual bonuses. Petitioner contends that, as the stockholders often worked twelve to fourteen hours a day and the success of the business depended upon their efforts, the entire amounts taken by the stockholders were reasonable salaries for the services they rendered and were deductible expenses in determining the net income of petitioner. Petitioner's counsel argues that had the stockholders voted themselves salaries of $70 per week there

could be no question that such amounts were reasonable, when they paid approximately that much to employees who worked only eight hours a day as compared with their twelve hours or more. He states that the stockholders were foreign-born Italians, with little formal education, and explains that the false entries in the petitioner's books were the idea of their bookkeeper upon whom they had depended since 1926 for the keeping of their records.

While respondent argues that the regulations[1] prohibit the deduction under one provision of law of amounts deducted under another provision, that is not what is attempted here. Petitioner is seeking not a double deduction, but an alternative deduction. If it is established that the amounts or any part of them were in fact paid as compensation for the services performed by the stockholders, and their total compensation was reasonable in amount, the deduction may be allowed as a business expense. The burden is upon petitioner to show this. However, since the stockholders are also employees, amounts distributed may, as respondent contends, represent division of the profits rather than payment of compensation for services.

As sole and equal owners the stockholders were at liberty to vote themselves any salaries they might choose, so long as the amounts were reasonable. Minutes of a stockholders' meeting in January 1938 show that they fixed their salaries at $2,320 each for the year, with a $35 per week authorized drawing account for 52 weeks or $1,820, plus $500 more to be paid as they should later, as directors, determine. They withdrew in cash another $12,000, which was charged to merchandise purchases, but $3,500 drawn in December as a bonus was immediately returned to the corporation. In 1939 they voted to increase their salaries to $3,320 each. The authorized weekly drawing account of $35 each remained the same. They drew $3,500 in November, which was charged to merchandise purchases, but bonus checks amounting to $10,500 issued in December were returned to the corporation in January following. In 1940 they increased their salaries to $40 per week, effective August 5. They drew no bonuses, but drew $1,500 in February to invest in a business venture with Jack Rudy and drew $6,845.74 in the latter part of the year, at least part of which was used to finance the venture with Rudy. The bookkeeper who initiated the practice of false entries was discharged before July 1938, yet the stockholders continued the use of this method of procuring cash thereafter, although the succeeding bookkeeper, Matteson, advised against it. The practice was carried to such an extent that Sam Maggio testified he could not now distinguish the purchase records which represented actual purchases from those which were false entries made to procure cash for distribution among the stockholders. While it is

---

[1] Art. 23 (a)–1, Regulations 101, and sec. 19.23 (a)–1 of Regulations 103.

alleged that the amounts thus drawn were distributed equally among the stockholders and amounted to about $35 per week for each, this is not borne out by the record. The amounts determined by the respondent to be fictitious payments vary considerably from month to month in 1938, as in January only $10 was taken thus, in February $406, in March $2,093, and thereafter the amount ranged from $918 to $1,200 per month. In 1939 the use of fictitious cash vouchers for this purpose was evidently discontinued and the use of checks was not resorted to until November, when the amount of $3,500 was drawn through four checks. In 1940 there was one check for $1,500 issued on February 28 and admitted by Sam Maggio to be a false entry, and 24 checks drawn between August 6 and December 17, amounting to $6,845.74, were found by the respondent to be false entries. The petitioner does not question the amounts determined by the respondent.

The petitioner's argument is that the stockholders needed more money for living expenses for their growing families and took these additional amounts as salaries for this purpose, the use of false entries being a device for which their bookkeeper was responsible. The respondent says the withdrawals were a means of distributing profits. The petitioner apparently paid no dividends, as such, in the taxable year, but paid regular salaries in amounts voted by the stockholders. While the comparative regularity of the withdrawals made in 1938 lends some credence to petitioner's argument that they were taken as additional compensation to meet current needs, it is to be noted that the practice stopped at the end of the year and was not again resorted to until November of 1939. If the money was needed for current expenses of the stockholders, as petitioner claims, it was not consistent that the practice was stopped at the end of the year. The need must have been as great in 1939 and 1940, yet lesser amounts were withdrawn in those years and, at least in 1940, were certainly used for other purposes than living expenses. It is more in accordance with the established facts to conclude that petitioner was distributing profits in 1938 and that, having succeeded in showing a book loss for the year and thereby escaping income tax, it was not necessary to continue the distribution in 1939 until the profits were ascertainable. The withdrawals in November of 1939 were made when a profit could be foreseen, and very evidently they constitute a distribution of profits. In 1940 the withdrawals were used, at least in part, to finance the venture with Rudy, rather than to meet the current living expenses of the stockholders. This money was used for investment and not for salaries. We conclude, therefore, that the amounts by which merchandise purchases were overstated in the taxable years before us were not payments of salaries, deductible under section 23 (a) of the Revenue Act of 1938 or section 23 (a) of the Internal Revenue Code.

The respondent disallowed $3,500 taken as a deduction on the 1938 return and $10,500 taken as a deduction on the 1939 return as bonuses paid to the stockholders of petitioner for services rendered. Respondent states that these were excessive deductions and that, since the checks issued to the stockholders were deposited in petitioner's bank account, the amounts were not actually expended by petitioner and are not deductible as salaries or compensation for services.

It is clear from the resolution of the directors on December 20, 1938, authorizing the bonuses of $500 for that year and requiring that the same amounts be loaned back to the corporation, that the payment of the amounts was an empty gesture. The checks were issued and redeposited to petitioner's account. The amounts were never received by the stockholders. Checks issued in December 1939 in the amount of $1,500 to each stockholder were deposited to the petitioner's account in January 1940. While minutes of the directors' meeting at which the issuance of 1939 bonus checks was authorized were not found, it seems that the same result was intended. The effect of the procedure was to show an expenditure for salaries diminishing the book profits and an equivalent receipt in the form of loans from the stockholders. No actual expenditure resulted and the stockholders remained in the same position as before, in so far as their ownership of the petitioner was concerned.

In *Harrington Co.*, 6 T. C. 720, we concluded that compensation voted to corporate officers contingent upon contribution of the same amounts to corporate surplus was not an expense incurred in the taxable year, since the amounts were not at any time available to the officers and therefore were not constructively received by them. In *Royal Mfg. Co. v. Commissioner*, 139 Fed. (2d) 958, affirming B. T. A. memorandum opinion, it was held that where dividend checks were endorsed and redeposited to the corporation's account, the corporation might not have a dividends paid credit, since the control of the proceeds never passed irrevocably to the stockholders.

In this case the stockholders had no intention of receiving the proceeds of the bonus checks as salary payments in the respective taxable years, and, therefore, the issuance of the checks was not in fact a payment of a business expense in those years. The respondent did not err in disallowing deduction of the bonus payments.

On the 1938 return petitioner deducted several items as bad debts, one of which was an amount of $1,572.11 shown as due from Knickerbocker Hotel, with the explanation, "Unable to Collect." Petitioner paid this amount by check dated September 15, 1937, to Hollywood Knickerbocker. The check was marked "Maggio Party." It appears that in the summer of 1937 the Maggios had an afternoon party at the Knickerbocker Hotel in Hollywood. Petitioner now admits that the item was not a bad debt, but contends that the expense of the party

was a business expense and is deductible as such, since the party was for the benefit of customers with whom the petitioner had business dealings and since it was given at the hotel in an effort to procure business from the hotel as a prospective purchaser of champagne. It is stated that the deduction of the item was taken in the 1938 return because it had not been taken in the 1937 return. It is obvious that the expense of such a party held in 1937 and paid for in that year may not be taken as a deduction on petitioner's 1938 return, whether or not it was a legitimate business expense. Respondent properly disallowed this deduction.

With respect to the year 1940, the respondent added $33,641.52 to the gross income of petitioner from merchandise sales as representing income shown on the books of Imperial Valley Produce Co. The internal revenue agent testified as follows concerning an interview with Sam Maggio in May 1941:

> I asked him specifically about one check for $1,500 made payable to the Imperial Valley Produce Company.
>
> Mr. Maggio stated that that check was to purchase the business of a Mr. Goebel Yates.
>
> I asked him further if that business was owned by the corporation, and he said yes. I then asked him why the sales and purchases and other items of income and deductions of the Imperial Valley Produce Company were not incorporated into the records and income tax returns of the Maggio Bros. Co. Inc.
>
> He stated that he didn't want the bookkeeper, Mr. Hampton Foreman, who prepared the 1940 income tax return of the corporation to know, or any other person to know that the Maggio Bros. Co. Inc., owned and operated the Imperial Valley Produce Company.
>
>     \*    \*    \*    \*    \*    \*    \*
>
> \* \* \* I recall Mr. Maggio stated that $1,500 was used as a part payment to purchase the business of Mr. Yates. I asked him specifically if the items which are noted on the check were actually delivered to the Maggio Bros. Co. Inc. He said, "No." He said that all he knew was that he bought Yates out and got a truck.

Petitioner now contends that Imperial Valley Produce Co. was the name of a business owned by the Maggios and one Jack Rudy in partnership, the Maggios having a 50 percent interest and Jack Rudy 50 percent. It appears that the business was formerly operated by Yates, who testified that he owned a Ford tractor and semitrailer and operated in El Centro, Brawley, and Holtville, California, taking orders and buying and selling produce. He had no dealings with the Maggios, but sold his truck and route to Rudy in February 1940 for $3,000 and Rudy thereafter operated the business as Valley Produce. Sam Maggio testified that a partnership agreement was drawn up and signed; that the business was operated about a year; that the Maggios put about $8,000 in it; that a loss was sustained; and that Rudy gave petitioner a note dated June 1, 1944, for $2,646.33 to cover his half of the loss. The agreement, he said, named Jack Rudy and Calegaro

Vitale as the partners. Vitale was the father-in-law of Paul Maggio and performed no services; the Maggios merely used his name. The funds invested by the Maggios were procured from petitioner by making false entries in the books of petitioner. Matteson testified that Sam Maggio told him they were buying Yates' business and that Rudy was to operate it for them and with them and that the purchase included a truck.

While the evidence is conflicting, we are of the opinion that it is sufficiently shown that the Imperial Valley Produce Co. was a separate business entity from petitioner, and that Rudy was a partner or joint adventurer with the petitioner. This is shown by the fact that Rudy paid $3,000 for the business, of which only half appears to have been contributed from petitioner's funds, that Rudy made the purchase without disclosing the participation of the others, and that a separate set of books was kept, and it appears that Rudy ultimately gave a note payable to the petitioner for his share of the loss, for which he would not be liable if he had been merely an employee and not a partner. The inclusion in full of the income and expenses of the Imperial Valley Produce Co. as income and expenses of petitioner in 1940 was error. However, since the funds invested in the business operated by Rudy were petitioner's funds and the note given by Rudy was payable to petitioner, we conclude that the business was operated by petitioner and Rudy as a partnership or joint venture. Half the profits of this business derived in 1940 are includible in petitioner's income for that year. While petitioner contends that a loss was sustained, the respondent's figures indicate that as far as 1940 is concerned a profit resulted. Certainly petitioner has not shown that a loss was sustained in 1940 from this venture.

The respondent determined penalties of 50 percent of the deficiencies, on the ground that the deficiencies were due to fraud with intent to evade tax, and that liability for the penalties was incurred under section 293 (b) of the Revenue Act of 1938 and section 293 (b) of the Internal Revenue Code. The burden is upon the respondent to establish fraud with intent to evade tax. *T. G. Nicholson,* 38 B. T. A. 190.

Petitioner conceded that some of the book entries were false, but contends that the purpose of the falsification was not to evade tax and that no fraud upon the United States resulted, since the amounts taken by the stockholders through the false entries were actually taken as salaries.

The stockholders were not deceiving themselves by the falsification of the books and could not intend to deceive their bankers by showing a losing business. The only possible conclusion is that they intended to deceive the tax agencies of the State and Federal Governments as to the petitioner's profits. The stockholders followed a

course of action obviously directed to the diminution of their income tax liability. While legitimate actions in this direction, or tax avoidance, may not be penalized, any fraudulent or illegal actions or concealment of true profits through false bookkeeping constitutes attempts at tax evasion and affords grounds for the assertion of penalties. In this case the profits realized by petitioner were concealed through manipulations and false bookkeeping. In 1938, by charging amounts to merchandise purchases, $12,001.48 of profits were distributed to the stockholders. In December the book profits were reduced further by $3,500 through the issuance of bonus checks charged to salaries, which were never paid. In filing the return for 1938 petitioner took a bad debt deduction of $1,572.11 for an item which was not a debt nor a business expense of that year. As a result of these actions a loss of $403.26 was shown on petitioner's return instead of a profit. In 1939 the actual profits were reduced by $3,570 by distributing profits to the stockholders and charging the amount through false entries to merchandise purchases, and by $10,500 more through the issuance of bonus checks which were never paid. For 1939 the petitioner was thus able to show a loss of $332.79 instead of a profit on its books and tax return. In 1940 the false entries of money withdrawn, at least in part, to finance the venture with Rudy reduced profits by $8,345.74, so that the net profit shown on the books and returns was untrue. The returns were filed with the knowledge that they were based upon false book entries. We conclude that the petitioner's returns for 1938, 1939, and 1940 were false and were filed with intent to evade tax, and that at least a part of the deficiency for each of these years was due to fraud with intent to evade tax.

*Decision will be entered for the respondent in Docket Nos. 111268 and 1664. In Docket No. 5125 decision will be entered under Rule 50.*