T.C. Memo. 1997-421


UNITED STATES TAX COURT


MAX BURTON ENTERPRISES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26467-95.                    Filed September 22, 1997.


<u>James A. Jensen</u>, <u>Charles J. Ingber</u>, and <u>Joel P. Leonard</u>,
for petitioner.

<u>Robert S. Scarbrough</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined a deficiency of

$214,220 in petitioner's Federal income tax for the tax year

ended June 30, 1990.  The issue for decision is whether

deductions claimed by petitioner for salary and bonuses paid to

its officers, who were also shareholders, exceeded reasonable compensation.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, petitioner's principal place of business was in Tacoma, Washington. During the year in issue, petitioner produced and sold stove-top grills, stove-top burner covers, and other kitchen accessories.

Petitioner was incorporated in the State of Washington on September 5, 1979, by Max Burton. Max Burton was the father of Linda Burton (Ms. Burton) and Alfred Burton (Mr. Burton) and the husband of Evelyn Burton. Ms. Burton was married to Robert Denovan (Denovan).

From September 13, 1979, through June 30, 1983, Max Burton served as president and treasurer, and Mr. Burton served as vice president and secretary, of petitioner. From July 1, 1983, through his death on July 3, 1997, Max Burton was president and treasurer, Ms. Burton was vice president, and Mr. Burton was secretary, of petitioner. From July 7, 1987, through June 30,

1990, Ms. Burton was president, Denovan was vice president, and Mr. Burton was secretary and treasurer, of petitioner.

Immediately prior to Max Burton's death, the outstanding shares of petitioner were owned as follows:

| Owner | Shares Owned |
|---|---|
| William Mueller | 500 |
| Max Burton | 7,300 |
| Linda Burton | 500 |
| Alfred Burton | 1,100 |
| Robert Denovan | 600 |
| Total | 10,000 |

The 500 shares of stock owned by William Mueller were redeemed by petitioner for $5,000 during the tax year ended June 30, 1990. As of June 30, 1990, the outstanding shares of petitioner were owned as follows:

| | Number of Shares Held | Percentage of Shares Held |
|---|---|---|
| Linda Burton | 1,100 | 44% |
| Alfred Burton | 1,100 | 44% |
| Evelyn Burton | 150 | 6% |
| Robert Denovan | 150 | 6% |

In November 1985, Max Burton was diagnosed with cancer. He underwent chemotherapy and surgery. During his illness, petitioner's business, as described by Ms. Burton, "pretty much ran itself." Attempts to sell the business had been unsuccessful, and Max Burton was anxious to have the business continue. Max Burton spoke to Ms. Burton, Mr. Burton, and Denovan about continuing the business. Ms. Burton was initially

reluctant but agreed only when Max Burton consented to her ideas about increasing the level and scope of business activity.

In June 1986, Max Burton and Ms. Burton went to Korea, where the burner covers that were sold by petitioner were manufactured. They observed a cooking concept known as "bulgogi", in which meat was cooked on a metal plate placed over hot charcoal. As of January 1, 1987, Ms. Burton took over the affairs of petitioner. By 1987, petitioner, primarily through the efforts of Ms. Burton, had adapted the bulgogi cooking concept to American stove burners. The "Burton Stove Top Grill" was first sold in the U.S. market in 1987.

Ms. Burton attended community college for 2 years after high school. After taking over petitioner's business, she attended continuing education classes in finance for small businesses, computers, advertising, letter writing, brochure writing, and employee relations. Between 1976 and 1978, she worked with her father as he started the burner cover business, but she was not paid for that work. After completing her 2 years of college, she worked for Alaska Airlines for a year. She then worked for the Port of Seattle Police Department for 5 years, but she left there in 1982 when she married Denovan, who was a sergeant with the Port of Seattle Police Department.

In 1982, Ms. Burton was employed in petitioner's business. At that time, Ms. Burton made initial sales calls, developed

sales promotional material, and developed an in-house system of tracking customers to increase sales.  Because of declining business and differences with her father about business decisions, Ms. Burton left petitioner in 1985 and began to work for Continental Airlines.

Ms. Burton worked at Continental Airlines until 1987 and remained as an employee on inactive status until 1990.  While at Continental Airlines, she was a customer service agent for about 6 months and then was promoted to a supervisory position.  She very much enjoyed that job and particularly the valuable travel benefits available by reason of that employment.

After the death of Max Burton, no employee of petitioner had executive responsibilities other than Ms. Burton, Mr. Burton, and Denovan.  Ms. Burton was responsible for the general management of petitioner.  She directly supervised the other two officers, established company goals and philosophies, and directed manufacturing quality control.  She was responsible for seeking overseas manufacturers, and she personally negotiated manufacturing and shipping agreements with them.  Many of the contracts that were negotiated by Ms. Burton were with Korean companies.  She traveled to foreign countries, including Korea, Taiwan, and China, in order to seek overseas manufacturers and to negotiate manufacturing and shipping agreements.

Ms. Burton established and was personally involved in the operation of petitioner's public relations division, creating various advertising and sales-related literature and other promotional materials. She designed the packaging material for petitioner's products and promoted petitioner to various national and regional newspapers. As petitioner's spokespersons and goodwill ambassadors, Ms. Burton and Denovan planned and personally participated in national trade shows to promote petitioner's products since 1987.

Ms. Burton implemented a strategic change in petitioner's marketing focus. Prior to her becoming president, petitioner had sold its goods primarily to small giftware shops. She eliminated petitioner's catalog/retail sales and concentrated on selling petitioner's products on a wholesale basis. To implement the change in marketing focus away from the small giftware shops to the large national department stores, new sales representatives were required.

Denovan replaced petitioner's existing force of giftware sales representatives with houseware sales representatives. Denovan assembled a nationwide team of sales representatives, managed through a network of sales organizations. Ms. Burton and Denovan negotiated commission agreements with petitioner's sales representatives and agreed to pay the sales representatives a commission of up to 15 percent. As a result of its change in

marketing strategy, petitioner secured national department stores including J.C. Penney's, Bloomingdale's, the Bon Marche, Dayton Hudson, Marshal Field's, and Dillards as new customers for petitioner's products.

When Ms. Burton became president of petitioner, petitioner had a $60,000 line of credit with the Bank of Puget Sound. When the Bank of Puget Sound refused to increase petitioner's line of credit, Ms. Burton approached other banks. SeaFirst Bank agreed to provide petitioner with a $100,000 line of credit. From 1988 through 1990, Ms. Burton and Mr. Burton worked closely with Robert Drugge, a vice president of SeaFirst Bank, to increase petitioner's line of credit to finance petitioner's expansion. SeaFirst Bank began providing letters of credit that were used by petitioner and issued to manufacturers of petitioner's products. On or about June 1, 1990, SeaFirst Bank increased petitioner's line of credit to $2,700,000. During the relevant periods, Ms. Burton, Mr. Burton, and Denovan signed personal guaranties to guaranty the repayment of lines of credit extended by the Bank of Puget Sound and SeaFirst Bank.

Mr. Burton, as secretary and treasurer of petitioner, was responsible for all accounting functions of petitioner, prepared financial plans and budgets, prepared loan applications, and was in charge of relations with SeaFirst Bank. Mr. Burton studied accounting and computer operations at a community college.

Beginning in 1982, Mr. Burton designed, installed, and maintained the computer system of petitioner.  Part of that system included a program that tracked customer responses to advertisements and a program used for the company's accounting.  At all relevant times, Mr. Burton also worked for a company known as Fiserv, installing computer systems for banks.

As vice president of petitioner, Denovan developed and executed sales and marketing strategies and was responsible for organizing and managing petitioner's national sales representatives.  He was responsible for hiring employees and was in charge of the shipping of petitioner's products from suppliers to vendors.  During the calendar year 1990, petitioner employed a total of 30 employees.  At all relevant times, Denovan was employed full time by the Port of Seattle Police Department, where he was responsible for training and scheduling special teams of police.

Petitioner had gross receipts and retained earnings for its tax years as follows:

|                  | 1987      | 1988      | 1989        | 1990        |
|------------------|-----------|-----------|-------------|-------------|
| Gross receipts   | $990,388  | $975,254  | $1,222,973  | $4,675,219  |
| Retained earnings | 215,154   | 231,401   | 241,839     | 341,239     |

On June 29, 1990, bonus checks were issued by petitioner. Bonuses were paid to Ms. Burton, Mr. Burton, and Denovan in the amounts of $700,000, $200,000, and $100,000, respectively. Twenty percent of these amounts was withheld and paid to the

Internal Revenue Service as Federal income tax.  The proceeds of the bonus checks were immediately returned to petitioner in exchange for promissory notes dated June 29, 1990.  The bonuses that were paid to petitioner's employees during the calendar year 1990, other than amounts paid to its officers, were each less than $1,000.

The total compensation (salary and bonus) deducted by petitioner for its tax years was as follows:

|                  | 1984    | 1985   | 1986    | 1987    | 1988    | 1989    | 1990     |
|------------------|---------|--------|---------|---------|---------|---------|----------|
| Linda Burton     | $22,078 | 0      | $ 600   | $11,000 | $24,000 | $59,225 | $751,750 |
| Alfred Burton    | 7,957   | $2,625 | 4,800   | 8,950   | 7,000   | 7,100   | 217,750  |
| Robert Denovan   | 0       | 0      | 0       | 0       | 800     | 3,500   | 110,750  |

Petitioner had a group medical and life insurance plan for all of its employees, including its officers.  The officers decided to take their compensation in the form of salary and bonuses and not to adopt a pension or other retirement plan.  Petitioner did not pay dividends.

Respondent determined that the amount of compensation that was paid to the above individuals was unreasonable.  The salaries that were claimed were allowed as reasonable compensation, but bonuses were reduced as follows:

| | |
|---|---|
| Ms. Burton's salary | $ 51,750 |
| Bonus allowed | 258,880 |
| Total allowed | $310,630 |

| | |
|---|---|
| Mr. Burton's salary | $ 17,750 |
| Bonus allowed | 88,890 |
| Total allowed | $106,640 |
| | |
| Denovan's salary | $ 10,750 |
| Bonus allowed | 56,630 |
| Total allowed | $ 67,380 |

OPINION

Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered". Section 1.162-9, Income Tax Regs., provides that bonuses paid to employees are deductible "when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided that such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered."

Whether an expense that is claimed pursuant to section 162(a)(1) is reasonable compensation for services rendered is a question of fact that must be decided on the basis of the particular facts and circumstances. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). The burden is on petitioner to show that it is entitled to a compensation deduction larger than that allowed by respondent. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

Under certain circumstances, prior services may be compensated in a later year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930); American Foundry v. Commissioner, 59 T.C. 231, 239 (1972), affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976). However, in such instances, the taxpayer must establish that there was not sufficient compensation in the prior periods and that, in fact, the current year's compensation was to compensate for that underpayment. Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. on another ground 965 F.2d 1038 (11th Cir. 1992).

The cases contain a lengthy list of factors that are relevant in the determination of reasonableness, including: The employee's qualifications; the nature, extent, and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with gross income and net income; the prevailing general economic conditions; a comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and the amount of compensation paid to the particular employee in previous years. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115 (6th Cir. 1949), affg. a Memorandum Opinion of this Court; see also Commercial Iron Works v. Commissioner, 166 F.2d 221, 224 (5th Cir. 1948). In Elliotts, Inc. v. Commissioner, 716 F.2d

1241, 1245-1247 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282, the Court of Appeals for the Ninth Circuit divided the factors into five broad categories, to wit, the employee's role in the company; comparison of the employee's salaries with those paid by similar companies for similar services; the character and condition of the company, including the complexities of the business and general economic conditions; factors indicating a conflict of interest, such as the employee's shareholder status; and internal consistency in a company's treatment of payments to employees. No single factor is determinative. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980). When the case involves a closely held corporation with the controlling shareholders setting their own level of compensation as employees, the reasonableness of the compensation is subject to close scrutiny. Owensby & Kritikos, Inc. v. Commissioner, supra; Elliotts, Inc. v. Commissioner, supra at 1246.

Respondent relies on Maggio Bros. Co. v. Commissioner, 6 T.C. 999, 1006 (1946), and contends that the bonuses in question were not paid during petitioner's 1990 tax year. Respondent argues that the payments by checks dated June 29, 1990, and immediate loans back to petitioner "lacked economic substance and were entered into solely for tax-avoidance purposes." Respondent

acknowledges that, because this argument was not set forth in the statutory notice, respondent bears the burden of proof on this issue. We are not persuaded that the evidence in the record supports the conclusion that bonuses were not actually paid during the tax year in issue. Respondent has not proven that this case is comparable to Maggio Bros. Co. v. Commissioner, supra at 1006, where "the stockholders had no intention of receiving the proceeds of the bonus checks as salary payments in the respective taxable years". Id. We do, however, consider the facts concerning those transactions as part of our analysis of whether the compensation deducted by petitioner was reasonable.

A second area of dispute between the parties is whether the bonuses that were paid for the fiscal year ended in 1990 were intended to compensate the recipients of those bonuses for undercompensation in earlier years. Ms. Burton, Mr. Burton, and Denovan each testified credibly that they accepted minimal compensation in the early developmental years in anticipation that their efforts would be rewarded in later years. We are persuaded that the bonuses that were paid in June 1990 were intended in part to compensate for undercompensation in earlier years.

Petitioner must also prove that its executive employees were in fact undercompensated in earlier years. Respondent argues that the executives were not undercompensated in earlier years

based on limited sales and low or negative return on equity in the earlier years. Each party presented expert testimony in support of its positions on appropriate compensation levels. We are not bound by the opinion of any expert when the opinion is contrary to our own judgment. Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 597 (1989), affd. 933 F.2d 1084 (2d Cir. 1991). We may embrace or reject expert testimony, whichever in our judgment is most appropriate. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938). Thus, we are not restricted to choosing the opinion of one expert over another but may extract relevant findings from each in drawing on our own conclusions. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). Here, the experts' usefulness is primarily in the data that they collected and analyzed rather than in their ultimately subjective evaluations of petitioner's officers.

Respondent's expert, E. James Brennan III (Brennan), determined "maximum" and "highest average" annual total compensation levels for each position. He acknowledged that, in comparison to other officers in similar businesses, petitioner's officers were undercompensated. He concluded that Ms. Burton was entitled to a high level of compensation and that during fiscal years 1988 and 1989 Ms. Burton was paid approximately $67,000 below the average total compensation amounts paid to chief executive officers of bonus-paying companies of similar size.

Brennan then attempted to justify the undercompensation by referring to Ms. Burton's limited relevant experience and lack of formal credentials.  He opined:

> If Petitioner's top financial and sales executives (who worked only part-time * * *) were similarly credited with half the highest average rates for experienced full-time executives in same-size enterprises, that would create approximately $45K in undercompensation in FY88, and approximately $40K in FY89.  Such amounts are more than made up by granting them the highest averages in FY90, when they were still part-time executives with minimal objective credentials.

We agree that the executives' limited experience and lack of formal credentials could be factors to be taken into account. There is, however, no evidence in the record of the experience or credentials of those persons earning the salaries that the experts used for comparison, and petitioner's business is not of the character requiring formal education.  Thus perceived deficiencies in formal training of the employees should not be used as a direct offset from compensation determined by the use of comparables.

Petitioner's expert, Tracy A. Bean (Bean) of Arthur Andersen LLP, did not address the limited experience and credentials of the executives.  Nor did she consider the lack of complexity of the business operations of petitioner.  She added $257,665 for long-term incentives and $16,623 for retirement benefits to the cash compensation averages of the comparable companies.  We believe that these additions are unwarranted without proof that

petitioner's employees could command such incentives in a business controlled by outside investors. See Elliotts, Inc. v. Commissioner, 716 F.2d at 1245.

Bean did not determine reasonable salaries for each of the executives separately. Using comparisons at the 75th percentile, she concluded that petitioner "could have paid compensation to its executive team for 1987 to 1990 in the amount of $1,411,700." We are not persuaded that the amounts should be aggregated in this manner. Rather, compensation to each officer should be separately evaluated. Bean's "team" approach inappropriately treats all three executives as performing above average services.

Upon consideration of all of the data in the experts' reports, the stipulated facts, and the testimony of petitioner's officers concerning the roles that they performed in petitioner's business, we conclude that Ms. Burton's contributions were extraordinary but that those of Mr. Burton and Denovan were not. Thus Ms. Burton's compensation should take into account Brennan's "highest maximum" ($378,260) and Bean's 90th percentile ($312,905) compensation to chief executive officers and add undercompensation acknowledged by Brennan for 2 years. In addition to her role as chief executive officer, Ms. Burton shared with Denovan many duties of a sales executive and is entitled to a supplement for that role. See Elliotts, Inc. v. Commissioner, supra at 1245.

Mr. Burton's compensation should take into account Brennan's "highest average" ($73,540) and Bean's median ($68,741) for chief financial officers as well as the undercompensation acknowledged by Brennan for 2 years. Denovan's compensation should take into account Brennan's "highest average" ($89,430) and Bean's median ($81,937) for top sales executives and undercompensation acknowledged by Brennan for 2 years. Petitioner has not persuaded us that the undercompensation levels exceeded those acknowledged by Brennan and thus has failed to meet its burden of proving greater entitlements.

Using our best judgment on the entire record, we conclude that, for the fiscal year ended June 30, 1990, reasonable compensation, including compensation for earlier years, is $525,000 for Ms. Burton and $160,000 for Mr. Burton. The amount determined in the same manner for Denovan would exceed the amount paid to him during that year, and petitioner's deduction is limited to the amount actually paid. To take account of these conclusions,

Decision will be entered under Rule 155.